UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **WILLIAM STRUNA,**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**ANAMARIA ZONI (LEONARDI),** individually; **ANTONIO LEONARDI,** as heir and fiduciary of the Decedent Renzo Leonardi; and **ALESSANDRA LEONARDI,** as heir and fiduciary of the Decedent Renzo Leonardi,<br><br>      **Defendants.** | Civil Action No.<br><br>**ECF CASE**<br><br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff William Struna, by way of Complaint against Defendants Anamaria Zoni (Leonardi), individually, Antonio Leonardi, as heir and fiduciary of the Decedent Renzo Leonardi, and Alessandra Leonardi, as heir and fiduciary of the Decedent Renzo Leonardi, alleges as follows:

## INTRODUCTION

1.      This matter involves fraud, breach of fiduciary duty, a pattern of racketeering activity and other tortious conduct relating to the purchase and subsequent sale of a valuable sculpture called *Head of a Woman (Fernande)* by the artist Pablo Picasso.

2.      Plaintiff William Struna entered into a contract with Decedent Renzo Leonardi granting the latter, for a period of three years, the exclusive right to authenticate the sculpture as an original; to sell the sculpture; and to receive half of the proceeds of any such sale.

3.      Decedent represented to Plaintiff that, in his expert opinion, the sculpture was likely not an original casting; that there was insufficient provenance to obtain a certificate of

authenticity, and that, as a result, it was far less valuable.  Decedent made these statements with knowledge that they were false.

4.      Decedent also falsely represented there was a third party who sought to purchase the sculpture when, in fact, the actual purchaser was Decedent.

5.      Decedent used these misrepresentations to induce Plaintiff to sell the sculpture to Decedent in or about the summer of 2016 for $1 million.

6.      Defendant Anamaria Zoni (Leonardi), the wife of the decedent, aided him in this endeavor and engaged in a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.

7.      On January 19, 2021, Plaintiff brought a special proceeding in the Supreme Court of the State of New York, County of New York for pre-action discovery from Sotheby's, Inc. ("Sotheby's").  The case was captioned *In the Matter of the Application of William Struna vs. Sotheby's, Inc. et al*, Index No. 150602/2021.

8.      On March 24, 2021, the Court ordered Sotheby's to reveal, *inter alia*, whether it had "brokered a sale of a bronze sculpture by the artist Pablo Picasso called Head of a Woman (Fernande), and if so, the sale price … as well as any document demonstrating the provenance of the sculpture, its authenticity, and its value …"

9.      On April 20, 2021, Sotheby's provided documents demonstrating that, on May 17, 2019, it had sold *Head of a Woman (Fernande)* on Decedent's behalf at a private auction at its branch in London, England for $24 million, and that both the authenticity of the sculpture and its provenance had been duly documented.

2

**PARTIES**

10.     Plaintiff William Struna ("Struna" or "Plaintiff") is an individual residing in New York, New York and Shepherdstown, West Virginia.

11.     Upon information and belief, Defendant Anamaria Zoni (Leonardi) ("Defendant Anamaria") is an individual residing in Trento, Italy.   Defendant Anamaria was the wife of the Decedent Renzo Leonardi ("Decedent" or "Decedent Leonardi").

12.     Upon information and belief, Defendant Antonio Leonardi ("Defendant Antonio") is an individual residing in Rome, Italy and is the son of the Decedent.

13.     Upon information and belief, Defendant Alessandra Leonardi ("Defendant Alessandra") is an individual residing in Bologna, Italy and is the daughter of the Decedent.

**JURISDICTION AND VENUE**

14.     This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a)(2) (diversity) because Plaintiff is a citizen of New York and West Virginia and Defendants are citizens or subjects of a foreign state (Italy) and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because, as set forth *infra*, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

16.     Alternatively, because the Decedent and/or Defendants had contacts with this judicial district which would be sufficient to subject them to personal jurisdiction if this district were a separate state, venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (d).

## FACTS COMMON TO ALL COUNTS

17.     Upon information and belief, in or about the autumn of 1909, the artist Pablo Picasso molded out of clay a sculpture called *Head of a Woman (Fernande)* ("*Fernande* bronze sculpture").

18.     Upon information and belief, there are twenty (20) known authentic original *Fernande* bronze sculptures, plus nine (9) additional commissioned authentic sculptures made in the 1960's.

19.     In or about the early 1980's, Struna became the owner of a *Fernande* bronze sculpture ("the Struna bronze *Fernande*").  Struna acquired the sculpture from an individual named James St. Lawrence O'Toole.  The sculpture, however, was not accompanied by any document that proved it to be an authentic and original work by Picasso.

20.     In or about 2003, Struna was introduced to the Decedent Leonardi, who was a professor of physics at the University of Trento and a founder of the European Centre for Theoretical Studies in Nuclear Physics and Related Areas (ECT*) in Trento, Italy.

21.     Decedent discussed with Struna the former's studies on the technical aspects of the *Fernande* bronze sculpture as well as Decedent's collaboration with Dr. Derek Pullen, Chief Sculpture Conservator at the Tate.

22.     During these discussions, Decedent stated that he had developed equipment that, through laser measurements, could conclusively ascertain the authenticity -- or lack thereof -- of a sculpture.

23.     Thereafter, during numerous discussions between Struna and Decedent, the latter held himself out as an expert in the authentication of works of art generally and of *Fernande* bronze sculptures in particular.

4

24.     During these discussions, Decedent Leonardi offered his services to Struna as an expert qualified to authenticate and to assist in the sale of the Struna bronze *Fernande.*

25.     From in or about 2004 to in or about 2009, Decedent Leonardi had numerous phone conversations with Struna regarding the possibility of obtaining a certificate of authentication from the Picasso Foundation, and the sale of the Struna bronze *Fernande* to third parties.

26.     During these conversations, Decedent Leonardi stated that the Struna bronze *Fernande* may or may not be authentic and may or may not be authenticated by the Picasso Foundation.

27.     On or about April 11, 2009, Decedent Leonardi emailed Struna and stated that there was a risk that the "bronze [would] not [be] recognized as authentic" and that the Picasso Foundation "could even have the right to confiscate it as a fake if declared as such!"  Decedent stated that, due to these issues, "it is important [that he] play the role of the interface."

28.     Decedent told Struna that if the Struna bronze *Fernande* was not properly authenticated and was thereafter seized by the Picasso Foundation then Struna would receive no compensation.

29.     Similarly, in an attachment to a February 21, 2013 email, Decedent Leonardi represented to Struna that he had studied

> the Head of Fernande [for] more than 10 years. For some casts, (including yours), we have performed the most powerful exam one can do today for the purpose of comparison between various casts and the original ... As I discussed with you**, your cast is at the border line of a surmolage [sic]** however defendable and I have for it an interesting provenance. The best is to immerse it with the other casts on the general publication we are preparing so that it will be set on the side of the good ones (emphasis added).

30.     The following month, in a March 17, 2013 email, Decedent Leonardi stated to Struna "[r]ecently I illustrated to some of my collaborators the preliminary results of the scanned measurements on your bronze and compared [it] with the original plaster. … [they are] inclined to think that **yours is a good surmolage [sic] but not an original cast**... [because] the origin of the bronze is not supported by any documentary evidence apart [from] your statements." (emphasis added).

31.     He noted further that "**MoMA is now associated to [sic] our 'research' on Fernande. This increase[s] and reinforce[s] my credibility on the project.**" (bold in original).

32.     At the time that Decedent Leonardi made the aforementioned statements in February and March 2013, he knew that the Struna bronze *Fernande* was not a surmoulage but rather was derived directly from the plaster modeled by Picasso; as such, he knew that these statements were false.

33.     On or about April 29, 2013, Plaintiff and Decedent Leonardi duly executed an agreement (the "2013 Agency Agreement") before a Notary Public of the State of New York in the City of New York.

34.     The 2013 Agency Agreement stated in relevant part that

upon the acceptance by the art community [of the Struna bronze *Fernande*] and the sale of the said bronze Struna will convey one half interest to Leonardi in consideration for his work on the authentication and sale of the bronze. … Leonardi has exclusive right to sell the bronze.  The sale price will be evenly split between Struna and Leonardi for a minimum purchase price for a private buyer of two million US dollars ($2.000.000 US dollars) … This contract will expire in three (3) years from the date April 29th, 2013.

35.     The 2013 Agency Agreement provided that the Struna bronze *Fernande* would be stored at Cirkers Fine Art Storage facility in New York City.

36.     Plaintiff granted these rights to Decedent Leonardi in consideration of Decedent's efforts to sell and authenticate the Struna bronze *Fernande*.  As evidenced by the correspondence between the parties, authentication meant both a scientific authentication through Decedent's expert laser measurements and through Decedent's application to the Picasso Foundation for the latter's *imprimatur* of authenticity.

37.     Thereafter, Decedent Leonardi made multiple trips to New York to, *inter alia*, perform testing of the Struna bronze *Fernande* at a facility in Long Island.

38.     In or about January 2016, Decedent Leonardi became aware that the Picasso Foundation would issue a certificate of authenticity for the Struna bronze *Fernande*.

39.     At or around that time, the aforementioned Dr. Pullen of the Tate took measurements and performed an XRF (X-ray fluorescence) test on the Struna bronze *Fernande*.

40.     As a result of Pullen's measurements and test, Decedent Leonardi knew that the Picasso Foundation would issue a certificate of authenticity.

41.     Decedent Leonardi did not inform Struna that the Picasso Foundation would issue a certificate of authenticity.

42.     On or about March 25, 2016, Decedent Leonardi presented the results of his studies on the Struna bronze *Fernande* at the exhibition "Picasso. Sculptures" at Musée National Picasso in Paris, which was attended by the world's most reputable Picasso scholars.

43.     On April 7, 2016, Decedent Leonardi emailed Struna regarding the presentation at the above conference and reported that he had been approached by a third person who allegedly wanted to buy the Struna bronze *Fernande*.

44.     A little less than three weeks later, on April 27, 2016 -- which was three days before the 2013 Agency Agreement's three (3) year term would expire -- Decedent Leonardi

emailed Struna and represented that he had secured a buyer who would buy the Struna bronze *Fernande* for $2 million and would make payment within 30 days.

45.     In the April 27, 2016 email, Decedent Leonardi stated that "the price reflects the fact that the bronze has not been authenticated.  The buyer is aware that there is no certificate of authenticity and she is willing to buy the bronze without one..."  Leonardi further stated that the buyer requested that her identity not be disclosed.

46.     The statements made by the Decedent Leonardi, as set forth in paragraphs 43-45, *supra*, were knowingly false.

47.     Decedent Leonardi knew there was no third party who sought to purchase the Struna bronze *Fernande*.

48.     Decedent Leonardi also knew that the Struna bronze *Fernande* was an original casting and was not a surmoulage; that the provenance was sufficient to obtain certification from the Picasso Foundation; and that, upon the issuance of this certification of authenticity, the value of the Struna bronze *Fernande* would increase exponentially.

49.     In a May 24, 2016 email, an attorney for Decedent Leonardi threatened suit against Mr. Struna if he did not agree to sell the Struna bronze *Fernande* to the buyer Decedent had allegedly secured.

50.     In a May 27, 2016 email, an attorney for Decedent Leonardi stated to Mr. Struna, "The Picasso Committee has stated publicly that they [sic] may refuse to authenticate a work that does not have a good enough provenance.  We know that the bronze has little to no provenance and the research carried out by my client to date has not been particularly encouraging. More research is needed."  As Decedent Leonardi was aware, these statements were knowingly false.

51.     A contract of sale was executed on June 10, 2016 ("The June 10, 2016 Contract of Sale").

52.     Contrary to the representations as set forth in paragraph 44, *supra*, and unknown to Mr. Struna, the buyers were Decedent Leonardi and Defendant Anamaria.

53.     Upon information and belief, in order to buy the Struna bronze *Fernande*, Decedent Leonardi and Defendant Anamaria borrowed up to $1 million from third parties in Italy.

54.     Decedent Leonardi inspected and took possession of the bronze *Fernande* while in New York City.

55.     At no time did Decedent Leonardi and/or Defendant Anamaria inform Struna that they were the actual buyers.

56.     The June 10, 2016 Contract of Sale stated in relevant part: "Representations By the Buyer.  To induce Seller to enter into this agreement, and acknowledging that the Seller is relying on the following representations in deciding whether to sell the Work and that such reliance is reasonable, the Buyer represents to the Seller … **the Work has not been authenticated by the Picasso Administration and/or Picasso Authentication**…."  (emphasis added).

57.     At the time this statement was made, Decedent Leonardi and Defendant Anamaria knew authentication by the Picasso Administration was forthcoming.

58.     On or about December 10, 2017, the Picasso Administration issued an authentication certification for the Struna bronze *Fernande*.

59.     Upon information and belief, from June 2016 until, at a minimum, in or around the winter of 2017-18, the Struna bronze *Fernande* remained in New York City at the Cirker's Fine Art Storage facility.

60.     In or about December 2017, Olivier Camu of the auction house Christie's valued the Struna bronze *Fernande* at between 15 and 25 million British pounds, or approximately $20-33 million.

61.     On or about May 17, 2019, Decedent Leonardi sold the Struna bronze *Fernande* for $24 million at a private sale brokered by Sotheby's in London, England.

62.     In the Private Sale Statement, Sotheby's described the Struna bronze *Fernande* as follows:

TÊTE DE FEMME (FERNANDE)
Inscribed *Picasso*
Bronze
…
Conceived in 1909 and cast before 1924.
**Claude Picasso has confirmed the authenticity of this work.**

PROVENANCE:

Ambroise Vollard, Paris[1]
(*probably*) Gottlieb Reber, Cologne & Lausanne (acquired from the above before 1924)[2]
James St. Lawrence O'Toole, New York (acquired from the above *circa* 1953)[3]
Private Collection, New York (acquired from the above by the early 1980s)[4]
Acquired from the above by the present owner.

[1] See *Cézanne to Picasso, Ambroise Vollard, Patron of the Avant Garde*, Rabinow, Ed. … referencing that **Vollard acquired the originals (plasters) of 5 early sculptures by Picasso, including the Tête, before the opening of his Picasso exhibition in late 1910** although no written details of the transaction survive. …

[2] **Ambroise Vollard sold, as early as 1924, a Cubist Head cast to Gottlieb Reber** …**An unpublished photograph exists in the Reber family archives of a cast of the *Tête de femme (Fernande)* in G F Reber's apartment in Lausanne in 1924. A further photograph shows the work reinstalled at the Chateau de Béthusy after 1928** … **G.F. Reber's now deceased son recalled in conversation that his father's cast of tête de femme (Fernande) had the same unique lugs inside the neck as this work.**

[3] **Art dealer James St. L. O'Toole**. … [I]n 1939 he opened his own gallery at 33 East 51st Street in New York City…. **Records on file confirm a long acquaintance between O'Toole and Reber from 1931 onwards. A**

**memorandum in the Reber archives confirms that O'Toole and Dandi were in contact with Reber with regard to acquiring his cast of *Tête de femme (Fernande)* in June 1952.**

(emphasis added).

63.     Sothehy's description of the provenance for the Struna bronze *Fernande* makes no reference to Plaintiff's ownership of the sculpture.  Rather, it stated as follows:

PROVENANCE:

Ambroise Vollard, Paris
(probably) Gottlieb Reber, Cologne & Lausanne (acquired from the above before 1924)
James St. Lawrence O'Toole, New York (acquired from the above circa 1953)
Private Collection, New York (acquired from the above by the early 1980s)
Acquired from the above by the present owner

(footnotes omitted).

64.     At no time did Decedent Leonardi and Defendant Anamaria inform Struna of the Struna bronze *Fernande's* aforementioned provenance; the Picasso Administration's authentication of the sculpture; the Camu valuation or the Sotheby's sale as described in paragraphs 58 and 60-62, *supra*.

65.     To the contrary, Decedent Leonardi actively sought to conceal the authentication, valuation and sale of the Struna bronze *Fernande*.  In fact, had he offered it for sale at a public auction, instead of a private sale, the Struna bronze *Fernande* could have potentially yielded substantially more but would also have attracted public attention and be reported in art publications, ultimately alerting Plaintiff.  Decedent Leonardi decided not to sell the Struna bronze *Fernande* at a public auction because he did not want Struna to learn that it had been authenticated as an original and surreptitiously sold by his agent, Decedent Leonardi, for 12 times the price Struna had been deceived to sell it for, to Decedent Leonardi.

66.     On July 6, 2019, Decedent Leonardi died.

67.     On or about March 27, 2020, in an email rejecting a request for a commission on the proceeds of the sale of the Struna bronze *Fernande* claimed by an Italian art dealer who had introduced Decedent Leonardi to Plaintiff, Defendant Anamaria wrote, "I lived next to Renzo for more than fifty years, together we fought and shared every pain, every glory, every sacrifice and every decision." She stated that it was "Renzo and I, nobody else" who purchased the sculpture.

68.     In November 2019, Defendant Anamaria executed before the Italian *Notaio*, Paolo Piccoli and filed in the Court of Trento, Italy, a formal renunciation of Decedent Leonardi's estate which she disclaimed in its entirety.

69.     On or about November 10, 2019, the "Leonardi's Estate Declaration" (*Dichiarazione di Successione*) as filed by the same *Notaio*, Paolo Piccoli, indicates that Defendant Antonio and Defendant Alessandra accepted Decedent Leonardi's estate, as heirs, *pro rata*.

70.     Article 456 of the Italian Civil Code states that probate begins after an individual has died. Article 752 of the Italian Civil Code further provides that the heirs of a decedent inherit the latter's assets but are also liable for all liabilities, debts and obligations of the deceased person.

71.     Accordingly, pursuant to Italian law, Defendant Antonio and Defendant Alessandra "stand in the shoes" of the Decedent Leonardi and are proper parties for suit relating to claims against him.

**FIRST CAUSE OF ACTION**
**(Fraud- Defendant Alessandra Leonardi and**
**Defendant Antonio Leonardi, as heirs and fiduciaries**
**of the Decedent Renzo Leonardi)**

72.     Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

73.     As set forth in greater detail *supra*, on numerous occasions, Decedent Leonardi made material misrepresentations and/or omissions of fact regarding, *inter alia*, the authenticity of

the Struna bronze *Fernande,* the sufficiency of the provenance for purposes of obtaining a certification from the Picasso Foundation as to its authenticity, and the existence of a third party who sought to purchase it.

74.    Contrary to Decedent Leonardi's representation, there was no third-party buyer who requested anonymity.  Rather, as set forth *supra,* Decedent Leonardi and Defendant Anamaria were the purchasers of the Struna bronze *Fernande.*

75.    Moreover, Decedent Leonardi's laser measurements had established that the Struna bronze *Fernande* was an original casting and not a surmoulage and that the Picasso Administration would issue a certification of authenticity, which would cause the value of the Struna bronze *Fernande* to increase exponentially.

76.    Moreover, Decedent Leonardi failed to inform Struna of the Picasso Administration's issuance of an authentication on or about December 10, 2017; the Christie expert Camu's valuation of the Struna bronze *Fernande i*n or about December 2017 for approximately $20-33 million; and the private sale brokered by Sotheby's in May 2019 for $24 million, let alone that he and his wife were the real buyers instead of the fictitious third party on whose behalf Decedent Leonardi had claimed he was purchasing it from Struna on June 10, 2016.

77.    With regard to the private sale, upon information and belief, Decedent Leonardi decided not to sell the Struna bronze *Fernande* at a public auction for the specific purpose of concealing from Struna the fact that both Decedent's scientific measurements and the Picasso Foundation had authenticated it as an original.

78.    Decedent Leonardi made the aforementioned material misrepresentations and omissions with knowledge of their falsity and with intent to induce Struna's reliance.

79.     Given that Decedent was a professor of physics who represented that he had equipment that could ascertain the authenticity of a sculpture; that he had collaborated and/or was collaborating with the Chief Sculpture Conservator at the Tate as well as the Museum of Modern Art; and that he was an expert in the authentication of works of art generally and of *Fernande* bronze sculptures in particular, Struna justifiably relied on Decedent's material misrepresentations and omissions.

80.     As evidenced by the fact that, due to this justifiable reliance, Struna agreed to sell the Struna bronze *Fernande* for $2 million rather than for its actual value of at least $24 million, Struna has been damaged.

81.     Pursuant to Article 752 of the Italian Civil Code, Defendant Alessandra and Defendant Antonio, as Decedent Leonardi's heirs, are liable for Decedent Leonardi's fraudulent actions.

### SECOND CAUSE OF ACTION
**(Breach of Fiduciary Duty - Defendant Alessandra Leonardi and
Defendant Antonio Leonardi, as heirs and fiduciaries
of the Decedent Renzo Leonardi)**

82.     Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

83.     As set forth *supra*, in or about the end of April 2013, Plaintiff and Decedent Leonardi entered into the 2013 Agency Agreement in which the Decedent agreed to engage in efforts to authenticate the Struna bronze *Fernande* and, in turn, was granted the exclusive right to sell the bronze for a minimum of $2 million.

84.     The 2013 Agency Agreement further provided that, in exchange for his efforts, Decedent Leonardi would be entitled to receive one-half of the proceeds of any sale.

85.     As such, under the 2013 Agency Agreement, Decedent acted as the agent of his principal, Plaintiff.  He therefore had the authority to negotiate on Plaintiff's behalf and, provided that the $2 million minimum price was met, to bind Plaintiff to a contract for the sale of the Struna bronze *Fernande*.

86.     Decedent also had the authority to represent Plaintiff in discussions with the Picasso Foundation regarding the parties' efforts to authenticate the Struna bronze *Fernande*.

87.     Accordingly, Decedent owed Plaintiff a fiduciary duty to act in a loyal manner for the benefit of Plaintiff in all matters related to the agency relationship.

88.     Decedent Leonardi knowingly breached his fiduciary duty to Plaintiff Struna.  This is evidenced by his multiple fraudulent acts of commission and omission regarding, *inter alia*, the authenticity of the Struna bronze *Fernande* and the sufficiency of the provenance for purposes of obtaining a certification from the Picasso Foundation as to its authenticity.

89.     In addition, Decedent Leonardi falsely represented that there was a third party who sought to purchase the bronze.

90.     In purchasing the Struna bronze *Fernande* for himself, Decedent engaged in unauthorized self-dealing which was neither permitted nor contemplated by the Agency Agreement.

91.     Decedent also failed his duties, as agent, to disclose to Plaintiff the authentication by the Picasso Administration of the Struna bronze *Fernande* and to accurately account to Plaitiff his subsequent sale of the bronze for $24 million.

92.     As a direct and proximate result of Decedent's misrepresentations, fraudulent conduct and self-dealing, Plaintiff has been damaged.

93.     Pursuant to Article 752 of the Italian Civil Code, Defendant Alessandra and Defendant Antonio, as Decedent Leonardi's heirs, are liable for Decedent Leonardi's breach of his fiduciary duty.

**THIRD CAUSE OF ACTION**
**(Aiding and Abetting Fraud and Breach of Fiduciary Duty**
**- Defendant Anamaria Zoni (Leonardi))**

94.     Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

95.     As described in paragraphs 73-81 and 83-93, *supra*, Decedent Leonardi committed fraud and breached his fiduciary obligations to Plaintiff.

96.     As evidenced by, *inter alia*, her statements in the March 27, 2020 email as described in paragraph 67, *supra*, Defendant Anamaria knowingly participated in i) the scheme to falsely represent the existence of a third party who sought to purchase the sculpture and ii) in securing the funds of up to $1 million required to further that scheme.

97.     As such, Defendant Anamaria knowingly induced and/or participated in both Descendant Leonardi's fraud and breach of fiduciary duty.

98.     In committing this tortious act, Defendant Anamaria caused an injury to Plaintiff, who was in New York, and expected or reasonably should have expected the act to have consequences in New York.

99.     As evidenced by the fact that the Struna bronze *Fernande* was sold at a private sale brokered by Sotheby's in London, England, Defendant Anamaria derived substantial revenue from interstate or international commerce.

100.    In addition, as evidenced by, *inter alia*, her statements in the March 27, 2020 email as described in paragraphs 67, *supra*, the Decedent Leonardi acted in New York as the agent for

Defendant Anamaria and for her benefit, with her knowledge and consent and under control exercised by her.

101.    As a result of this fraud and breach of fiduciary duty, Plaintiff has been damaged.

**FOURTH CAUSE OF ACTION**
**(RICO- § 1962(c)- All Defendants)**

102.    Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

103.    As evidenced by, *inter alia*, her statements in the March 27, 2020 email as described in paragraph 67, *supra*, Defendant Anamaria associated with the Decedent Leonardi and an unnamed third person or persons for the purpose of authenticating and purchasing the Struna bronze *Fernande*.

104.    Decedent Leonardi and Defendant Anamaria directed said association and were partners in the enterprise along with an unnamed third person or persons who engaged in activities relating to the enterprise.

105.    Said enterprise lasted for over a decade, demonstrating a longevity sufficient to permit said parties to pursue the purpose of the enterprise.

106.    Said enterprise's activities affected interstate commerce as evidenced by the purchase and sale of works of art and the wiring of funds across state and international boundaries.

107.    Decedent Leonardi and Defendant Anamaria agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.  Specifically, Defendants engaged in acts of wire fraud proscribed by 18 U.S.C. § 1343 as set forth in Paragraphs 24-27, 30-37, 45-52 and 58-60, *supra.*

108.    Pursuant to and in furtherance of their fraudulent scheme, Decedent Leonardi and Defendant Anamaria committed multiple additional related acts of racketeering including using wire and mail to fraudulently induce Struna to sell the Fernande bronze sculpture to Defendants (as discussed in paragraphs 53-59, *supra*) and to fraudulently induce auction houses, such as Christies and Sotheby, to begin and ultimately conclude the auction and sale of the Fernande bronze sculpture (as discussed in paragraphs 61-64, *supra*).

109.    The acts of Wire Fraud set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

110.    Decedent Leonardi and Defendant Anamaria directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

111.    As a direct and proximate result of Decedent Leonardi and Defendant Anamaria's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property in that he was defrauded by Plaintiffs in the sale of the Struna bronze *Fernande*

112.    Pursuant to Article 752 of the Italian Civil Code, Defendant Alessandra and Defendant Antonio, as Decedent Leonardi's heirs, are liable for Decedent Leonardi's tortious actions.

### FIFTH CAUSE OF ACTION
**(RICO- § 1962(d)- All Defendants)**

113.    Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

114.    As set forth in paragraphs 103-111, *supra*, Decedent Leonardi, Defendant Anamaria and an unnamed person or persons agreed to and conspired to violate 18 U.S.C. § 1962(c).

Specifically, they conducted and participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c))

115.     Decedent Leonardi, Defendant Anamaria and an unnamed person or persons have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

116.     Decedent Leonardi, Defendant Anamaria and an unnamed person or persons knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

117.     As direct and proximate result of these acts of conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in his business and property in that he was defrauded in the sale of the Struna bronze *Fernande*.

118.     Pursuant to Article 752 of the Italian Civil Code, Defendant Alessandra and Defendant Antonio, as Decedent Leonardi's heirs, are liable for Decedent Leonardi's tortious actions.

### SIXTH CAUSE OF ACTION
**(Defendant Alessandra Leonardi and Defendant Antonio Leonardi,**
**as heirs and fiduciaries of the Decedent Renzo Leonardi-**
**Breach of Implied Covenant of Good Faith and Fair Dealing)**

119.     Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

120.     Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.

121.    The implied covenant of good faith and fair dealing obligates a promisor to fulfill any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the contract.

122.    It also requires a party to a contract to refrain from doing anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

123.    As noted *supra*, the 2013 Agency Agreement provided that the parties would work together to gain acceptance by the art community of the Struna bronze *Fernande* as an original; then to sell the sculpture; and to "evenly split" the proceeds of any such sale.

124.    As evidenced by his multiple fraudulent acts of commission and omission regarding, *inter alia*, the authenticity of the Struna bronze *Fernande* and the sufficiency of the provenance for purposes of obtaining a certification from the Picasso Foundation as to its authenticity, and the existence of third party who sought to purchase the sculpture when, in fact, the actual purchaser was Decedent, Decedent Leonardi breached the implied covenant of good faith and fair dealing.

125.    As a result of Decedent's breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged.

126.    Pursuant to Article 752 of the Italian Civil Code, Defendant Alessandra and Defendant Antonio, as Decedent Leonardi's heirs, are liable for Decedent Leonardi's aforesaid breach.

## SEVENTH CAUSE OF ACTION
**(Defendant Alessandra Leonardi and Defendant
Antonio Leonardi, as heirs and fiduciaries
of the Decedent Renzo Leonardi-
Negligent Misrepresentation)**

127.    Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

128.    As noted *supra*, Decedent represented that he possessed unique or special expertise in authenticating works of art generally and of *Fernande* bronze sculptures in particular.

129.    At a minimum, in making the aforementioned material misrepresentations and/or omissions of fact regarding the authenticity of the Struna bronze *Fernande* and the sufficiency of the provenance for purposes of obtaining certification from the Picasso Foundation as to its authenticity, Decedent failed to speak with care.

130.    As a proximate cause of Decedent's negligence, Plaintiff was harmed.

131.    Pursuant to Article 752 of the Italian Civil Code, Defendant Alessandra and Defendant Antonio, as Decedent Leonardi's heirs, are liable for Decedent Leonardi's negligent misrepresentation.

## EIGHTH CAUSE OF ACTION
**(Defendant Alessandra Leonardi and Defendant
Antonio Leonardi, as heirs and fiduciaries
of the Decedent Renzo Leonardi and
Defendant Anamaria Zoni (Leonardi)-
Unjust Enrichment)**

132.    Plaintiff realleges each of the allegations set forth above as if set forth herein at length. Eighth

133.    As evidenced by the fact that, as a result of his numerous material misrepresentations and omissions, Decedent Leonardi purchased the Struna bronze *Fernande f*rom

Struna for $1 million and was then able to sell it for $24 million, Defendant Alessandra, Defendant Antonio, as Decedent Leonardi's heirs, and/or Defendant Anamaria were unjustly enriched at Plaintiff's expense.

134.    Equity and good conscience demand that these defendants surrender such unjust enrichment and give restitution to Plaintiff.

WHEREFORE, Plaintiff William Struna demands judgment as follows:

A.    On the First Cause of Action and Second Cause Action against Defendant Alessandra Leonardi and Defendant Antonio Leonardi, as heirs and fiduciaries of the Decedent Renzo Leonardi for (a) compensatory damages of at least $23 million; (b) punitive damages; (c) attorneys' fees; (d) costs of suit; and (e) prejudgment interest of 9% as required under the civil practice law and rules.

B.    On the Third Cause of Action against Anamaria Zoni (Leonardi) for (a) compensatory damages of at least $23 million; (b) punitive damages; (c) attorneys' fees; (d) costs of suit; and (e) prejudgment interest of 9% as required under the civil practice law and rules.

C.    On the Fourth Cause of Action and Fifth Cause of Action against Defendant Anamaria Zoni (Leonardi) for (a) compensatory damages of at least $23 million; (b) treble damages; (c) attorneys' fees; (d) costs of suit; and (e) prejudgment interest of 9% as required under the civil practice law and rules.

D.    On the Sixth Cause of Action, Seventh Cause of Action and Eighth Cause of Actions, against Defendant Alessandra Leonardi and Defendant Antonio Leonardi, as heirs and fiduciaries of the Decedent Renzo Leonardi for (a) compensatory damages of at least $23 million; (b) attorneys' fees; (c) costs of suit; and (d) prejudgment interest of 9% as required under the civil practice law and rules.

## **JURY DEMAND**

Plaintiff William Struna demands trial by jury on all claims and issues so triable.


Dated:  Springfield, New Jersey
        July 13, 2021

                              **JAVERBAUM WURGAFT HICKS KAHN
                              WIKSTROM & SININS, P.C.**



                              By: /s/ Andrew Moskowitz_____
                                    Andrew M. Moskowitz, Esq.

                              505 Morris Avenue
                              Springfield, NJ 07081
                              (973) 379-4200

                              589 Eighth Avenue-21st Floor
                              New York, NY 10018
                              (212) 596-7656
                              amoskowitz@lawjw.com

                              Giacomo James Corrado, Esq.
                              745 Fifth Avenue, Suite 500
                              New York, NY 10151
                              (212) 838-0600
                              gjc@corradoesquire.com

                              Robert J. Frank, Esq. (pending *pro hac vice*
                              admission)
                              900 W. Washington Street, Ste. 1
                              Lewisburg, WV 24901
                              (304) 520-4925
                              Rob@rjflaw.com

                              Attorneys for Plaintiff William Struna