UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

WILLIAM STRUNA,

                    Plaintiff,

  -against-

ANNA MARIA ZONI (LEONARDI), individually;
ANTONIO LEONARDO, as heir and fiduciary of
the Decedent Renzo Leonardi; and ALESSANDRA
LEONARDI, as heir and fiduciary of the Decedent
Renzo Leonardi,

                    Defendants.

-----------------------------------------------------------x

21-cv-6040 (PKC)

OPINION AND ORDER

CASTEL, U.S.D.J.

        Plaintiff William Struna ("Struna"), the former owner of a valuable bronze Picasso sculpture called <u>Head of a Woman (Fernande)</u> (the "Sculpture"), alleges that he was fraudulently induced into selling the Sculpture to decedent Renzo Leonardi ("Renzo"), whom he had engaged to authenticate the Sculpture as an authentic and original work by Picasso,[1] sell the sculpture on his behalf and split in half with him the proceeds of any such sale. Struna alleges that Renzo, who already knew that the Sculpture was an original, instead of fulfilling his duties to Struna, schemed with the help of Renzo's wife, defendant Anna Maria Zoni (Leonardi) ("Anna Maria"), to buy the Sculpture from Struna at a steep discount by concealing that Renzo

---

[1] The TAC does not formally define the distinction between an "authentic" sculpture and an "original" sculpture. For example, the TAC mentions that "there are twenty (20) known authentic original Fernande bronze sculptures, plus nine (9) additional commissioned authentic sculptures made in the 1960's." (TAC ¶ 18.) For the purposes of this motion, the Court will assume that the two are used interchangeably as to the Sculpture formerly owned by Struna—that "authentication" of the Sculpture proves that the Sculpture is both an authentic Picasso work and that it is an original Picasso work, "derived directly from the plaster modeled by Picasso," as opposed to a "surmoulage." (TAC ¶ 32) which is a piece fraudulently made from a casting of a sculpture.

and his wife were the true buyers and falsely telling Struna that the Sculpture was likely not an authentic Picasso. According to Struna, Renzo and Anna Maria then obtained documentation authenticating the Sculpture as an original Picasso and flipped the Sculpture a few years later at a private auction brokered by Sotheby's in London for a profit of approximately $22 million.[2] (TAC ¶¶ 3-6, 8, 80.) Struna alleges that Renzo died just a couple of months after the Sculpture was sold at the private auction and defendants Antonio Leonardi ("Antonio") and Alessandra Leonardi ("Alessandra") became Renzo's heirs and fiduciaries.

    Invoking diversity jurisdiction, Struna now brings claims against Anna Maria, Antonio and Alessandra.[3] As to only Anna Maria, Struna brings claims for aiding and abetting fraud and breach of fiduciary duty. As to only Antonio and Alessandra, Struna brings claims for fraud, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing and negligent misrepresentation. As to all three defendants, Struna brings a claim for unjust enrichment. The defendants move to dismiss Struna's claims for lack of personal jurisdiction under Rule 12(b)(2), Fed. R. Civ. P., or alternatively, for failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P.

    For reasons to be explained, the Court concludes that there is no basis to exercise personal jurisdiction over the defendants. The defendants' motion to dismiss for lack of personal jurisdiction will be granted. Struna's request for jurisdictional discovery as to Anna Maria will be denied.

---

[2] The TAC is inconsistent as to the amount paid to purchase the Sculpture from Struna. At certain points, the TAC claims that Renzo and Anna Maria bought the Sculpture from Struna for $1 million, while claiming elsewhere that the purchase price was $2 million. (See, e.g., TAC ¶ 5, 80.) The TAC is clear as to the auction price, however, of $24 million. (TAC ¶ 61.)

[3] Struna claims to be a citizen of both New York and West Virginia. (TAC ¶ 14.) An individual may be a domiciliary—a citizen—of only one state. Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 42 (2d Cir. 2000) ("At any given time, a person has but one domicile."). The Court need not determine whether Struna's true citizenship is New York or West Virginia because there is no claim that he is an alien, and all three defendants are alleged to be citizens of Italy.

BACKGROUND

In adjudicating the motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2), Fed. R. Civ. P., and for failure to state a plausible claim for relief under Rule 12(b)(6), Fed. R. Civ. P., the Court accepts the factual allegations described below as true and the Court draws all reasonable inferences in favor of the plaintiffs as the non-movants. See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 85 (2d Cir. 2013) (per curiam) (Rule 12(b)(2)); In re Hain Celestial Grp., Inc. Sec. Litig., 20 F.4th 131, 133 (2d Cir. 2021) (Rule 12(b)(6)).

I.   Struna's Introduction to Renzo

As alleged in the TAC, Struna acquired the Sculpture in the early 1980s from an individual named James St. Lawrence O'Toole.  The Sculpture, however, was not accompanied by any documents proving it to be an authentic and original work by Pablo Picasso.  (TAC ¶ 19.)  Almost two decades later, around 2003, Struna was introduced to Renzo Leonardi, a professor of physics at the University of Trento and a founder of the European Centre for Theoretical Studies in Nuclear Physics and Related Areas, based in Trento, Italy.  (TAC ¶ 20.)  During their discussions, Renzo represented to Struna that he had studied the technical aspects of the Fernande sculpture—there are at least twenty authentic and original Fernande sculptures around the world (TAC ¶ 18)—and that he had collaborated with "Dr. Derek Pullen, the Chief Sculpture Conservator at the Tate," a famous British art institution.  (TAC ¶ 21.)  Specifically, Renzo claimed to Struna that he had developed equipment that, through laser measurements, could conclusively ascertain whether a sculpture was authentic or not.  (TAC ¶ 22.)

Struna alleges that during subsequent conversations with Struna, Renzo repeatedly held himself out as an expert in the authentication of artworks generally, and in particular, of Fernande sculptures.  (TAC ¶ 23.)  In these discussions, Renzo allegedly also

3

offered his services to Struna to assist in the authentication and sale of the Sculpture, and from around 2004 to 2009, Renzo had numerous phone conversations with Struna about the prospect of obtaining a certificate of authentication from the Picasso Administration[4] and selling the Sculpture to a third party. (TAC ¶ 25.) According to Struna, Renzo equivocated on multiple occasions during this period on whether the Sculpture was authentic, and on whether the Picasso Administration would issue a certificate of authentication as to the Sculpture. (TAC ¶ 26.) For example, in one email sent around April 11, 2009, Renzo allegedly stated that it was "important [that he] play the role of the interface" with the Picasso Administration because there was a risk that the "bronze [would] not [be] recognized as authentic" and that the Picasso Administration "could even have the right to confiscate it as a fake if declared as such!" (TAC ¶ 27 (alterations in original).) (See also TAC ¶¶ 28, 29.)

II.  Renzo and Anna Maria's Alleged Scheme

Struna claims that by early 2013, Renzo began to cast further doubt on as to both the authenticity of Struna's Sculpture and the chances that it would be authenticated by the Picasso Administration, representing that his collaborators were "inclined to think that [Struna's Sculpture] is a good surmolage [sic] but not an original cast." (TAC ¶ 30 (second alteration in original).) Renzo allegedly also claimed that his "credibility on the project" was "increase[d] and reinforce[d]" because the Museum of Modern Art was "now associated" with his research on the Fernande sculptures. (TAC ¶ 31.) The TAC alleges that during this period in early 2013, Renzo in fact knew that his statements casting doubt on the authenticity of Struna's Sculpture

---

[4] The TAC appears to interchangeably refer to the certifying entity as both the "Picasso Foundation," and the "Picasso Administration." (See, e.g., TAC ¶¶ 25, 56.) The parties also appear to treat the two names interchangeably in their briefs. (See, e.g., Def. Br. at 16 n.7; Struna Br. at 2.) For consistency, and because the sales contract references the "Picasso Administration" (TAC ¶ 56), the Court will refer to the certifying entity as the "Picasso Administration."

4

were false, and that Struna's Sculpture was an authentic casting derived directly from the plaster modeled by Picasso himself.  (TAC ¶ 32.)

Struna and Renzo entered into an agreement on April 29, 2013 (the "Agency Agreement"), which provided that Renzo would work towards the authentication and sale of the Sculpture in return for half the sales price of the Sculpture.  (TAC ¶ 33.)  Specifically, the Agency Agreement provided that:

> [U]pon the acceptance by the art community of [the Sculpture] and the sale of the said bronze Struna will convey one half interest to Leonardi in consideration for his work on the authentication and sale of the bronze. . . .  Leonardi has exclusive right to sell the bronze.  The sale price will be evenly split between Struna and Leonardi for a minimum purchase price for a private buyer of two million US dollars ($2.000.000 US Dollars) . . . This contract will expire in three years from the date April 29th, 2013.

(TAC ¶ 34 (ellipses in original).)  Struna alleges that as "evidenced by the correspondence between the parties, authentication meant both a scientific authentication through [Renzo's] expert laser measurements and through [Renzo's] application to the Picasso [Administration] for the latter's *imprimatur* of authenticity."  (TAC ¶ 36.)  Following the execution of the Agency Agreement, Renzo made multiple trips to New York, where the Sculpture was stored, to examine the Sculpture.  (TAC ¶¶ 35, 37.)

Struna alleges that in approximately January 2016, Renzo became aware that the Picasso Administration would issue a certificate of authenticity for Struna's Sculpture.  (TAC ¶ 38.)  To support this allegation, Struna claims that around January 2016, the aforementioned Dr. Pullen of the Tate took measurements and performed an X-ray fluorescence test on the Sculpture.  (TAC ¶¶ 39-40.)  The allegation appears to be that the results of the measurement and test indicated that the Sculpture was an authentic original Picasso, and therefore, the Picasso Administration would reach the same conclusion and therefore issue a certificate of authenticity.

5

Struna claims, however, that despite this alleged knowledge, Renzo did not inform him that the Picasso Administration would issue a certificate of authenticity for the Sculpture. (TAC ¶ 41.)

According to Struna, on April 7, 2016, Renzo e-mailed Struna to inform Struna that he had been approached by a third party who allegedly wanted to buy the Sculpture. (TAC ¶ 43.) As context, on March 25, 2016, Renzo had attended an exhibition on Picasso's sculptures at the Musée National Picasso in Paris, which was also attended by the world's most reputable Picasso scholars. (TAC ¶ 42.) According to the TAC, Renzo explained that he had been approached by the prospective buyer at the March 25, 2016 conference. (TAC ¶ 42.) On April 27, 2016, three days before the expiration date of the Agency Agreement, Renzo e-mailed Struna to represent that he had secured a buyer who would buy the Sculpture for $2 million and would make payment within 30 days. (TAC ¶ 44.) In the April 27, 2016 e-mail, Renzo stated that the $2 million price "reflects the fact that the bronze has not been authenticated. The buyer is aware that there is no certificate of authenticity and she is willing to buy the bronze without one." (TAC ¶ 45.) Renzo also stated that this prospective buyer had requested that her identity not be disclosed. (TAC ¶ 45.)

Struna alleges that in reality, Renzo's statements from his April 7, 2016 and April 27, 2016 e-mails were knowingly false, because the anonymous buyer in question was not a third party but instead, Renzo and his wife, Anna Maria. (TAC ¶¶ 46-47, 55.) Struna also alleges that Renzo, at this point, knew that the Sculpture was an original casting and would be able to obtain a certificate of authenticity from the Picasso Administration that would increase its value exponentially. (TAC ¶ 48.)

On May 24, 2016, an attorney for Renzo e-mailed Struna, allegedly threatening suit against Struna if he did not agree to sell the Sculpture to the anonymous buyer. (TAC ¶ 49.)

On May 27, 2017, an attorney for Renzo e-mailed Struna, allegedly stating that the "Picasso Committee has stated publicly that they [sic] may refuse to authenticate a work that does not have a good enough provenance. We know that the bronze has little to no provenance and the research carried out by my client to date has not been particularly encouraging. More research is needed." (TAC ¶ 50 (alteration in original).) Struna alleges that Renzo was aware that his own attorney's statements were knowingly false. (TAC ¶ 50.)

On June 10, 2016, a contract of sale was executed for Sculpture for $2 million dollars.[5] (TAC ¶¶ 51, 80.) Struna was allegedly unaware that contrary to representations by and on behalf of Renzo leading up to the sale, the anonymous buyer was actually Renzo and Anna Maria, who had borrowed up to $1 million from third parties in Italy to purchase the Sculpture from Struna. (TAC ¶¶ 52-53.) Struna alleges that at no time did Renzo or Anna Maria inform him that they were the ones purchasing the Sculpture from Struna. (TAC ¶ 55.) In describing this transaction, Anna Maria allegedly sent an email on March 27, 2020 to an Italian art dealer that she "lived next to Renzo for more than fifty years, together we fought and shared every pain, every glory, every sacrifice and every decision," and that it was "Renzo and I, nobody else" who purchased the Sculpture. (TAC ¶ 67.)

The sales contract also stated in part that "[t]o induce [Struna] to enter into this agreement, and acknowledging that [Struna] is relying on the following representations in deciding whether to sell the [Sculpture] and that such reliance is reasonable, the Buyer represents

---

[5] As noted, the TAC is inconsistent as to the amount paid to purchase the Sculpture from Struna, sometimes stating the sales price as $1 million and sometimes stating it as $2 million. (See, e.g., TAC ¶¶ 5, 80.) Along with their brief, defendants have submitted what they allege is the sales contract for the Sculpture (Doc 45-2), which Struna does not appear to contest. (Struna Br. at 6.) Interestingly, the contract appears to explicitly list "Renzo Leonardi" as the "Buyer" (Doc 45-2 at 2 of 12) and the "Purchase Price" as $1,000,000 (Doc 45-2 at 3 of 12). For the purposes of adjudicating the instant motions, the specific price paid does not affect the Court's conclusion that it cannot exercise personal jurisdiction here, and the Court does not resolve the factual discrepancies raised by the contract, which—contrary to Struna's claims that the buyer of the Sculpture was anonymous—names Renzo as the buyer.

7

to [Struna] . . . the [Sculpture] has not been authenticated by the Picasso Administration and/or Picasso Authentication." (TAC ¶ 56.) Struna alleges that at the time of the sales contact's execution in around the middle of 2016, Renzo and Anna Maria knew that authentication by the Picasso Administration was forthcoming. (TAC ¶ 57.)

> III.   The Sculpture's Authentication, Valuation and Auction

Approximately a year and a half following Renzo and Anna Maria's purchase of the Sculpture, on December 10, 2017, the Picasso Administration issued an authentication certification for the Sculpture. (TAC ¶¶ 57-58.) Shortly after the issuance of the authentication certification, a representative of the auction house Christie's valued the Sculpture at approximately $20 to 33 million. (TAC ¶ 60.) On May 17, 2019, Renzo sold the Sculpture for $24 million at a private auction brokered by Sotheby's in London, England. (TAC ¶¶ 9, 61.) In describing the Sculpture in a private sale statement, Sotheby's stated that "Claude Picasso has confirmed the authenticity of this work" and also discussed the provenance of the Sculpture, specifically, as having been owned by "Ambroise Vollard, Paris . . . (*probably*) Gottlieb Reber, Cologne & Lausanne . . . James St. Lawrence O'Toole . . . Private Collection, New York . . . [and] the present owner." (TAC ¶ 62.) The statement, which makes no reference to Struna's ownership of the Sculpture, described in detail how the Sculpture changed possession from Vollard, Reber, and O'Toole. (TAC ¶¶ 62-63.)

Struna alleges that Renzo or Anna Maria never informed him of the Sculpture's provenance as detailed above, nor did they inform him of the Picasso Administration's authentication of the Sculpture, Christie's valuation of the Sculpture following authentication or the sale of the Sculpture at the private Sotheby's auction for $24 million. (TAC ¶ 64.) Struna argues that Renzo actively sought to conceal the authentication, valuation and sale of the

8

Sculpture, submitting that "had [Renzo] offered it for sale at a public auction, instead of a private sale," the Sculpture "could have potentially yielded substantially more but would also have attracted public attention and [been] reported in art publications, ultimately alerting plaintiff." (TAC ¶ 65.)  In short, Struna claims that Renzo "did not want Struna to learn that [the Sculpture] had been authenticated as an original and surreptitiously sold by his agent . . . for 12 times the price Struna had been deceived to sell it for" to Renzo.  (TAC ¶ 65.)

    IV.    Renzo's Estate

According to the TAC, Renzo died on July 6, 2019, less than two months following the sale of the Sculpture for $24 million.  (TAC ¶ 66.)  In November 2019, Anna Maria executed a formal renunciation of Renzo's estate, disclaiming the estate in its entirety.  (TAC ¶ 68.)  On November 10, 2019, Renzo's children Antonio and Alessandra accepted Renzo's estate, as heirs, *pro rata*.  (TAC ¶ 69.)  This action followed.

DISCUSSION

    I.    Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

        A.    Rule 12(b)(2) Standards

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), Fed. R. Civ. P., a plaintiff bears the burden of demonstrating the court's personal jurisdiction over the defendants.  Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 34-35 (2d Cir. 2010).  The complaint's allegations are assumed to be true, and a plaintiff need only make a prima facie showing of personal jurisdiction.  Dorchester, 722 F.3d at 85.  The court construes any pleadings and affidavits in the light most favorable to the plaintiff and resolve all doubts in plaintiff's favor.  Id.  However, courts should "not draw argumentative inferences in the plaintiff's favor" or "accept as true a legal conclusion couched as a factual allegation."  In re Terrorist Attacks on

Sept. 11, 2001, 714 F.3d 659, 673 (2d Cir. 2013) (quotation marks omitted). A court has "considerable procedural leeway" on a Rule 12(b)(2) motion and may decide it on the basis of affidavits alone, permit discovery in aid of the motion, or conduct an evidentiary hearing. Dorchester, 722 F.3d at 84.

B. Applicable Law

Personal jurisdiction may be exercised over any defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Rule 4(k)(1)(A), Fed. R. Civ. P. "[I]n resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-part inquiry. First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996) (citing Savin v. Rainier, 898 F.2d 304, 306 (2d Cir. 1990)).

New York's long-arm statute, N.Y. C.P.L.R. § 302(a), governs the instant action, brought in the Southern District of New York. Therefore, if Struna shows that Anna Maria, Antonio and Alessandra are amenable to service of process under New York's long-arm statute,[6] Struna must then show that the Court's exercise of personal jurisdiction over the defendants is consistent with due process. Id.; Walden v. Fiore, 571 U.S. 277, 283 (2014).

As relevant here, New York's long-arm statute provides that "a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in

---

[6] Because Struna does not allege general personal jurisdiction over the defendants, the Court focuses only on the issue of exercising specific personal jurisdiction over defendants under the New York long-arm statute. "Specific jurisdiction . . . depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011).

person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state[.]" N.Y. C.P.L.R. § 302(a)(1).  The cause of action, however, must also "aris[e] from" the transaction of business within the state.  Id.  In other words, "[t]o determine the existence of jurisdiction under section 302(a)(1), a court must decide (1) whether the defendant 'transacts any business' in New York, and if so, (2) whether this cause of action 'aris[es] from' such a business transaction."  Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007) (citing Deutsche Bank Sec., Inc. v. Mont. Bd. Of Invs., 7 N.Y.3d 65, 71 (2006)).  "By this 'single act statute . . . proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.'"  Deutsche Bank Sec., Inc., 7 N.Y.3d at 71 (quoting Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988)).

        C.     Renzo's Transaction of Business Within New York

Here, the TAC plausibly alleges that Renzo had numerous, purposeful contacts with New York and that Struna's cause of action arises out of these contacts.  For example, Struna and Renzo allegedly executed the 2013 Agency Agreement before a Notary Public of the State of New York in the City of New York.  (TAC ¶ 33.)  Additionally, Renzo allegedly visited New York for the purposes of physically examining the Sculpture pursuant to his efforts to authenticate the Sculpture under the Agency Agreement.  (TAC ¶ 37.)  These allegations plausibly plead that Renzo "transacted business within the state" and that the Struna's present claim "ar[o]se from" that business transaction.  Walker, 490 F.3d at 246.

The parties dispute, however, whether under New York's long-arm statute, the Court may exercise personal jurisdiction over Antonio, Alessandra and Anna Maria, who are

11

domiciliaries of Italy. In resolving this dispute, the Court determines whether it can exercise personal jurisdiction over (1) Antonio and Alessandra as "executor[s] or administrator[s]" of Renzo's estate within the meaning of N.Y. C.P.L.R. § 302(a), and (2) Anna Maria as a "non-domiciliary" for whom Renzo acted as her "agent" in transacting business within the State of New York. N.Y. C.P.L.R. § 302(a).

### D. Personal Jurisdiction Over Antonio and Alessandra

Struna submits two arguments for the exercise of personal jurisdiction over Antonio and Alessandra: because "they are the *de facto* administrators" or executors of Renzo's estate for purposes of N.Y. C.P.L.R. § 302(a), or, in the alternative, because they are Renzo's "successors in interest."

As to the first argument—that personal jurisdiction over Antonio and Alessandra is proper because they "constitute the equivalent of an 'executor or administrator' under CPLR § 302(a)" (Struna Br. at 11)—Struna submits and cites to a sworn declaration by Michele Angelo Lupoi, a "professor of Italian Civil Procedure at the University of Bologna, School of Law" (Lupoi Decl. ¶ 1), to primarily contend the following. First, that "[u]nder Italian law, 'there is no estate administered by a court-appointed fiduciary who settles the decedent's debts, pays the estate taxes and expenses, and distributes to the heirs/beneficiaries the net proceeds of the estate.'" (Struna Br. at 12 (quoting Lupoi Decl. ¶ 7).) Second, that "the heir who accepts a decedent's estate *succeeds* to the decedent and, as such, is the decedent's *successor in interest* . . . a credit of the decedent . . . cannot seek payment from or sue the estate; rather it must seek payment from or sue the universal heirs." (Struna Br. at 12 (emphases in original) (quotation marks omitted) (quoting Lupoi Decl. ¶ 7).) Third, that "the heir is responsible for collecting the

credits and paying the debts of the estate and of the Decedent" as well as filing tax returns and paying various taxes. (Struna Br. at 13 (quoting Lupoi Decl. ¶ 16).)

The New York long-arm statute, however, does not purport to reach "*de facto* executors or administrators" of an estate but rather, "executor[s] or administrator[s]." As relevant here, New York's Surrogate's Court Procedure Act ("SCPA")[7] defines an "Executor" as "[a]ny person to whom letters testamentary have been issued," and defines an "Administrator as "[a]ny person to whom letters of administration have been issued." SCPA § 103(2), (20). These definitions do not provide alternative avenues for individuals to qualify as executors or administrators based on whether their powers and duties—due to the idiosyncrasies of their domicile's legal regime—resemble those of a duly appointed executor or administrator under New York law.

Significantly, the concept of a *de facto* fiduciary for an estate, such as a *de facto* executor or administrator, is not a novel concept in New York. See, e.g., Accounting of Sakow, 219 A.D.2d 479, 482 (1st Dep't 1995) (holding that an individual who appeared to "hold all the powers of a fiduciary" "was, in effect, the *de facto* executor of his father's estate" despite the existence of an "executrix *de jure*."); Roderigas v. East River Sav. Inst., 76 N.Y. 316, 324 (1879) (holding that an individual who had been named in a letter of administration could not be considered an administrator or even a *de facto* administrator because the letter of administration itself was jurisdictionally void).

Had the New York legislature wished to expand the reach of the New York long-arm statutes to *de facto* executors or administrators, it could have. Indeed, the SCPA provides that "a non-domiciliary alien," such as Antonio or Alessandra, is ineligible to receive letters of

---

[7] In New York, the Surrogate's Court exercises "full and complete general jurisdiction in law and in equity to administer justice in all matters relating to estates and the affairs of decedents." SCPA § 201(3).

13

administration or letters testamentary required to become an administrator or executor unless certain exceptions—irrelevant here—are met. SCPA § 707(1)(c). In short, the New York legislature did not explicitly expand the reach of its long-arm statute to *de facto* fiduciaries, which Struna claims Antonio and Alessandra to be, and the Court declines to do so now. Accordingly, the Court concludes that Struna has not plausibly pleaded that Antonio and Alessandra are "executor[s] or administrator[s]" under N.Y. C.P.L.R. § 302(a), and that as alleged, Antonio and Alessandra are not amenable to service of process under New York's long-arm statute as the executors or administrators of Renzo's estate. Metropolitan Life, 84 F.3d at 567.

    Struna's "successors in interest" argument for personal jurisdiction is also unavailing. "[W]hether liability as a successor in interest also entails being subject to personal jurisdiction where the actions of the predecessor would have made the predecessor subject—depends on the basis of successor liability." U.S. Bank Nat'l Assoc. v. Bank of Am. N.A., 916 F.3d 143, 156 (2d Cir. 2019). "[W]hile successor liability based on acquisition of a predecessor's assets does not necessarily make the defendant also amenable to jurisdiction where the predecessor's actions would have made the predecessor subject to specific jurisdiction, the rule is different where the successor liability of the defendant where the successor liability of the defendant derives from a *merger* with the predecessor." Id. (emphasis added). The Second Circuit has held that New York cases "imply, indeed virtually state, that where the successor status is based on merger, the merged entity is subject to jurisdiction wherever its merger partner's actions would have made the merger partner subject in a suit based on the merger partner's liability." Id. In so holding, the Second Circuit emphasized the "sound distinction in law between a statutory merger and an acquisition of assets." Id. (quoting Schenin v. Micro

14

Copper Corp., 272 F. Supp. 523, 526 (S.D.N.Y. 1967), which had been cited by a New York state case with approval).

While New York courts "recognize that in certain circumstances a successor corporation 'may inherit its predecessor's jurisdictional status,'" Semenetz v. Sherling & Walden, Inc., 21 A.D.3d 1138, 1141 (3d Dep't 2005), because the principle has—as far as this Court can tell—only been applied to corporate successors in interest, the Court declines to expand this exception to hold that natural persons domiciled in a foreign state may inherit their decedent parent's jurisdictional status for purposes of N.Y. C.P.L.R. § 302(a) as a result of inheriting their decedent parent's assets and liabilities.

Accordingly, the Court concludes that Struna has failed to plausibly plead a basis for personal jurisdiction over Antonio and Alessandra. Because the TAC's allegations fail to plausibly satisfy the first part of the two-prong personal jurisdiction inquiry—that Antonio and Alessandra are amenable to service of process and personal jurisdiction under New York law—the Court need not, and does not resolve whether exercising personal jurisdiction over Antonio and Alessandra would be consistent with due process under the United States Constitution. The motion to dismiss the claims against Antonio and Alessandra for lack of personal jurisdiction will be granted.

E.   Personal Jurisdiction Over Anna Maria

As to personal jurisdiction over Anna Maria, the Court must determine whether Anna Maria is a "non-domiciliary" for whom Renzo acted as her "agent" in transacting business within the State of New York. N.Y. C.P.L.R. § 302(a).

Under the New York long-arm statute, "there is jurisdiction over a principal based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the

15

knowledge and consent of, and under some control by, the nonresident principal.'" Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 85 (2d Cir. 2018) (quoting Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981)).  A plaintiff "need not establish a formal agency relationship" to establish that the agent's actions were attributable to the defendant.  Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d 32, 36 (2d Cir. 2001) (quoting Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988)).

As to the control factor, "joint participation in a partnership or joint venture establishes 'control' sufficient to make each partner or joint venturer an agent of the others." CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 366 (2d Cir. 1986).  Under New York law, "a partnership is a voluntary, contractual association in which persons carry on a business for profit as co-owners," Zohar v. LaRock, 185 A.D.3d 987, 991 (2d Dep't 2020) (brackets and quotation marks omitted), while "[a] joint venture is an 'association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge." Kaufman v. Torkan, 51 A.D.3d 977, 979 (2d Dep't 2008) (citation omitted).  "The essential elements of a joint venture are an agreement manifesting the intent of the parties to be associated as joint venturers, a contribution by the coventurers to the joint undertaking (i.e., a combination of property, financial resources, effort, skill or knowledge), some degree of joint proprietorship and control over the enterprise; and a provision for the sharing of profits and losses."  Id. (quotation marks and citation omitted).

As to due process, "[a]lthough the long-arm statute and the Due Process Clause are not technically coextensive, the New York requirements (benefit, knowledge, some control) are consonant with the due process principle that a defendant must have 'purposefully availed itself of the privilege of doing business in the forum.'"  Charles Schwab, 883 F.3d at 85 (quoting

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002)). Where the Second Circuit has "found personal jurisdiction based on an agent's contacts, [it] has never suggested that due process requires something more than New York law." Id. (citing Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 169 (2d Cir. 2010)).

The TAC alleges that Renzo was the one who communicated with Struna regarding the Sculpture, signed the Agency Agreement with Renzo in New York, and visited New York to both inspect and take eventual possession of the Sculpture. But the TAC also alleges that Renzo and Anna Maria planned and executed their purported scheme to purchase the Sculpture together, including borrowing up to $1 million from third parties in Italy to purchase the Sculpture from Struna. (TAC ¶¶ 52-53.) The TAC also discusses a March 27, 2020 e-mail from Anna Maria to an Italian art dealer—subsequent to purchasing the Sculpture from Struna and sale of the Sculpture at the private auction—in which Anna Maria allegedly stated that she and Renzo "shared every pain, every glory, every sacrifice and every decision," and that it was "Renzo and [Anna Maria], nobody else" who purchased the Sculpture from Struna.

The e-mail has not been presented on this motion, and discovery may reveal that her statements are simply Anna Maria's general opinions about her relationship with Renzo, as opposed to any purported scheme specifically regarding the Sculpture. The Court also recognizes that the TAC does not provide the full context of how "Renzo and I, nobody else" appears in the e-mail. But at the pleading stage, accepting TAC's factual allegations as true and drawing all reasonable inferences in Struna's favor, the Court concludes that the TAC plausibly alleges that Renzo, when transacting the business in New York that gave rise to the instant cause of action, was acting for the benefit of and also with the knowledge and consent of Anna Maria, "who shared every pain, every glory, every sacrifice and every decision" with Renzo.

17

As to the control factor, however, nothing in the TAC alleges that Anna Maria exercised a degree of control over Renzo as a legal matter, apart from a single conclusory allegation that "as evidenced by, *inter alia*, her statements in the March 27, 2020 email . . . the Decedent Leonardi acted in New York as the agent for Defendant Anna Maria and for her benefit, with her knowledge and consent and under control exercised by her." (TAC ¶ 100.)

Struna fails to plausibly allege that Renzo and Anna Maria had entered into a partnership or a joint venture as defined under New York law.[8] As to a potential partnership, nothing in the TAC plausibly alleges that Anna Maria and Renzo were in a "voluntary, contractual association in which [they carried] on a business for profit as co-owners." Zohar, 185 A.D.3d at 991. As to a potential joint venture, any claim here that Anna Maria and Renzo were operating "under a joint venture agreement must fail as a matter of law, since there is no provision for the sharing of losses" or profits. Kaufman, 51 A.D.3d at 979.

Struna's reliance on the co-conspirator theory of agency is also unavailing. Although "[c]ourts have regarded jurisdiction based on conspiracy as a subspecies of the agency rationale for jurisdiction," LaChapelle v. Torres, 1 F. Supp. 3d 163, 169 (S.D.N.Y. 2014) (collecting cases), in determining a defendant's membership in the conspiracy, the Court must still determine "whether '(1) the out-of-state co-conspirator had an awareness of the effects of the activity in New York, (2) the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) [ ] the co-conspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators." Id. (quoting Emerald Asset Advisors, LLC v. Schaffer, 895 F. Supp. 2d 418, 433 (E.D.N.Y. 2012)). While, as noted above, the TAC plausibly alleges that Anna Maria knew of and benefited from Renzo's activity in New

---

[8] As noted, joint participation in a partnership or joint venture establishes 'control' sufficient to make each partner or joint venturer an agent of the others." Naughton, 806 F.2d at 366.

York, the TAC does not plausibly allege beyond conclusory statements that Renzo acted at the behest of, on behalf of or under the control of Anna Maria.

Indeed, as it appears to the Court, apart from the aforementioned March 27, 2020 e-mail, which post-dates the allegedly ill-begotten purchase of the Sculpture from Struna in 2016 and the clandestine auction of the Sculpture in 2019, the only non-conclusory factual allegations in the TAC as to Anna Maria are that she (1) is Renzo's wife (TAC ¶¶ 6, 11), (2) is a citizen of Italy (TAC ¶ 11) and (3) filed a formal renunciation of Renzo's estate following his death. (TAC ¶ 68.) There are no facts alleged supporting a conclusion that she gave directions to Renzo in the purported scheme, or exercised any sort of influence on his actions or the purported scheme. There is no plausible allegation that she exercised sufficient control over Renzo such that he could be considered her "agent" under the New York long-arm statute, even under the co-conspiracy theory of agency.

Accordingly, the Court concludes that Struna has failed to plausibly allege that Anna Maria is amenable to service and personal jurisdiction under the New York long-arm statute. N.Y. C.P.L.R. § 302(a). Because the TAC's allegations fail to plausibly satisfy the first part of the two-prong inquiry for personal jurisdiction—that Anna Maria is amenable to service of process and personal jurisdiction under New York law—the Court need not, and does not resolve whether exercising personal jurisdiction over Anna Maria would be consistent with due process under the United States Constitution.

Struna also requests, in the alternative, that the Court order jurisdictional discovery as to the claims against Anna Maria instead of dismissing the claims for lack of jurisdiction. (Struna Br. at 20-21.) "A district court has wide latitude to determine the scope of discovery . . . and is typically within its discretion to deny jurisdictional discovery when the

19

plaintiff has not made out a prima facie case for jurisdiction." Daou v. BLC Bank, S.A.L., 42 F.4th 120, 133 n.6 (2d Cir. 2022) (alterations omitted) (quoting Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393, 401 (2d Cir. 2009)).  In light of Struna's failure to make out a prima facie case for personal jurisdiction over Anna Maria in his third amended—and fourth overall—pleading, the Court concludes that jurisdictional discovery is unwarranted and will deny Struna's request for jurisdictional discovery as to Anna Maria.

The motion to dismiss the claims against Anna Maria for lack of personal jurisdiction will be granted.

III.     Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

Because the Court finds that it cannot exercise personal jurisdiction over the defendants, the Court need not, and does not resolve the issue of whether Struna has failed to state a claim to relief under Rule 12(b)(6), Fed. R. Civ. P.

CONCLUSION

After consideration of all the arguments of the parties, including those not expressly referenced, the defendants' motion to dismiss is GRANTED.  Struna's request for jurisdictional discovery as to Anna Maria is DENIED.  The Clerk of the Court is respectfully directed to terminate the instant motion.  (Doc 44.)

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:   New York, New York
             September 7, 2022